We have three argued cases this morning. The first of these is number 162515, Microsoft Corporation v. Parallel Networks. Mr. Traylor. Thank you, Your Honor, and may it please the Court. The parallel patents claim a method for dealing with website congestion by spreading the processing of requests for webpages among multiple servers. Because others had already come up with that solution, Parallel tried to distinguish its claims by focusing on the term dynamic webpage generation request to a web server and arguing that its system required that there be only one such request, while the prior art systems, in particular the SWEB reference, required multiple requests. But request has a broad meaning, a message that asks for a webpage. And with that broad meaning, it was clear that the web server in the SWEB system received one request and then the SWEB system processed that same request. So before the Board, Parallel argued that things like the router request takes, the package it's in, how it's processed can Suppose I disagreed with you about your characterization of what was being built into the Board's view of where one request stops and another one starts. All the Board said was when the client, the client computer that is, has to reinitiate a message for whatever it is seeking, there is a new request. We don't care what the router is. We don't care what the URL is. I think you had a third thing. I'm not sure what that was. The package, whether it's an HTTP request. Right. Then why is that not a sensible, and I guess we have to say in the Phillips sense, the most reasonable construction of what this patent uses as the boundaries of a request? Here's why, Your Honor. To reach the conclusion that the fact that the client computer was involved again makes it a new request, the Board must have been thinking either that a request has to go directly from the web server to the page server or that somehow the client computer, if it doesn't, and it does touch other things, one of those things cannot be the client computer. But none of that is in the claims or in the patents. Well, did you ask the Board to clarify the claim construction in this respect? You seem to be saying, if I understand it, that you agree that there's a one request limitation in here, but that that means that the user can only make one request, not that the computer can't redirect, not to use the confusing word, the computer can't make a second request if the first request doesn't work out. We did not ask for a clarification because it didn't seem like we needed one. The construction was a message that asked for a web page. Well, given the fact that there was no clarification, why isn't it? I mean, this is sort of like the Hewlett-Packard thing where we have instructions to the jury and there's an effort later on to come up with a new claim construction. It seems to me that's a bit what you're doing here, that if you accept the Board's claim construction, it's reasonable to think that under these circumstances that there is a second request here. No, I don't think that's correct, Your Honor, and here's why. Because the patent makes clear that none of this routing or packaging or anything makes any difference. We know that because in Column 4, for example, the patent says that a web client makes a URL request. This URL request is examined by the web browser to determine the appropriate web server to route the request to. A little further down in Column 4, it says basically the same thing. The web client issues a URL request that is processed to determine proper routing. Now, what that means is that obviously the request exists independent of its routing. It also exists independent of its packaging. But that's the point I'm trying to make is that sounds like a claim construction argument. You're looking at the specification. You're saying it should properly be interpreted so that this second effort by the computer doesn't count as a second request. But you would make that argument before the board, and it seems to me that under their claim construction, it's reasonable to think that the computer's second request is a second request. No, I don't think so. And we did argue before the board that the subsequent involvement of the client computer didn't make any difference. And we did argue that the routing doesn't make any difference, the packaging doesn't make any difference. So certainly in that sense, we made the argument. And the point is that... Can I ask you this? Sure. If, as I understand your view of the request, the request is simply the substance of the message, the substance of content, the semantic content of it. If I had a bank of a million computers and I sent them each one simultaneously to send to a web server, give me the stock price of Microsoft right now. Is that a million requests or one request because they all say exactly the same thing? I think if they are all going to the... And this raises another important point, and it's a point where the board went astray. If they're all going to the web server, I think they're separate requests. The point where the board got confused, I think, and this is, I think, appendix B. But why is that? They all say exactly the same thing. They do, but they're separate initiations and they're going to the web server. And this is the point I was getting to. The way that the invention supposedly reduces website congestion... But now if you're distinguishing identical substance of content by the address C, why is that not equally true of the, I guess, the rerouted S1 in SWEB? It's going different address C. Well, it's going to the page server. It's not going to the web server. And what you're trying to avoid is congestion at the web server. That's the whole point of this. And that was one of the reasons the board said, well, the redirected request has to be a new request because it's creating the congestion that the patents were designed to avoid. But it's not. It's doing exactly the same thing as the patents. You have one request going to the web server, and then the web server is distributing that request to the appropriate page server. In the invention, in the patents, it does it through request forwarding. In SWEB, it does it through URL redirection. So it bounces it back off the client computer, but it never goes to that web server again. It's going to the appropriate page server. And that's a fundamental misunderstanding that the board had. What you're describing is more like the other place where they went astray, which was thinking that hitting a refresh, you know, refreshing a request is the same thing that SWEB is doing. But it's not. It's making a new request to a web server. And our expert explained that, but they just dismissed that distinction. But that distinction is at the heart of what the supposed innovation of these patents is. It's reducing congestion at the web server. Can I switch topics on the obviousness component? And I'm also interested in, let's call it the IBM argument, the Unix socket thing. It had struck me when I was reading SWEB that SWEB does say something about a teensy-weensy little bit of excess overhead. About a thousandth of a, you know, one of four milliseconds in a process that took four or five seconds. And therefore, and I guess my question is, except as to one or maybe a few of the dependent claims, I did not see your expert relying on that as a motivation to modify SWEB on the assumption that SWEB wasn't anticipatory. It was not that, you know, the calculation they go through that comes up with that millisecond. It's the earlier statement in SWEB where it talks about URL redirection has certain disadvantages, the additional pass request cycle and all of that. It's talking about the extra work basically that the client computer. But just putting aside the magnitude of that, I don't think your expert said that, cited that in the main portion of his declaration saying here's why it would be obvious to change. He didn't cite what you were referring to, but what you're referring to is different. The computation that they were doing in SWEB was not a comparison between URL direction and request forwarding. It was between their system and a system that doesn't use the distributed servers. So there are two different respects in which there's a disadvantage. And you're right, the processing difference that they calculate is minuscule there. But what they're talking about earlier on, which is what our expert was talking about, was the additional overhead of having to go back to the client computer and then back to the page server. Let me say, I'm not sure that I understand this. As I understand what the board said on the obviousness issue, is that the board said that it wouldn't have been obvious to substitute request forwarding for URL redirection because it hasn't shown that that would have been better. Is that a fair statement? I think that's what the board said. And is your position that there can be a motivation to modify even if it isn't shown to be better? Absolutely, and I think that's what KSR says. There are more than two, but in this case two different alternatives for accomplishing the same thing. Moving a request from one server to another. SWEB used URL redirection, but request forwarding, it's undisputed, was known in the art, was within the ability of one of ordinary skill, and it had certain advantages. And so we think that... What were the advantages? It was more efficient and when you do it... Let me ask more precisely. What did your expert identify as the advantages? Because I read the board to say, never mind whether it was better or not, you just haven't said why somebody would do it. Maybe it's an alternative, but why would somebody do it? Well, SWEB explains some of them, that you don't have the additional need. When you do... But your expert didn't rely on that excess overhead. I think he did, Your Honor. Where? He pointed to that passage in SWEB. Where? I think it's in paragraph 214 of his declaration. I'll try to find that. 11449. That sounds familiar. He talks about how request forwarding was known. Right. And he talks about advantages of request forwarding, right? Right. And then on 11450, he talks about, and this is about two-thirds of the way down the page, a person of ordinary skill would have been motivated to employ such a technique in a skilled manner. which is expressly concerned with efficient use. And then he quotes from SWEB about the resource constraints, network latency, and that sort of thing. And it goes on onto the next page. So I think that's what he is talking about. But he's not saying it's better than URL redirection, right? He is saying that request forwarding is an alternative and it has certain advantages over URL redirection, I believe. Well, that's what I'm not sure about. Where does he say it has advantages over URL redirection? He certainly says it has advantages over prior art, I guess, or whatever. Right, right. Well, I think what he is saying, by referring to SWEB and the resource constraints that SWEB is talking about, I think that he is saying that request forwarding is potentially a better way of dealing with those resource constraints. But entirely apart from that, even if it's not, even if the board is right about that, I think under KSR it's basically a simple substitution of one known method of doing something for another known method of doing it. It doesn't have to be shown to be better. It clearly doesn't have to be shown to be better, exactly. I see my time is running out. You mentioned the Unix sockets argument, Your Honor, in the IBM brief. Did you have a question about that? Maybe we'll save my question for the other side. Okay, well, and I would just on that subject, just very quickly, that's clearly disclosed in SWEB as another possible way of moving requests from one server to another. They seem to admit that now. It seems as though it boils down to enablement. Right, and on enablement, well, first of all, the board didn't address it at all. Enablement obviously is a legal question, requires factual findings. The board didn't address it. So I think just by raising enablement, I think that shows that it needs to go back so the board can look at that. And they're clearly, what their experts said, they cite their expert. Their expert only said SWEB doesn't explain how to do it. He doesn't even suggest that it was beyond the ability of one of ordinary skill, would have required undue experimentation or that sort of thing. So I will reserve. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Bovenkamp. Please, Court, Counsel. I think I'll start where Mr. Trell started with regards to the claim construction issue on requests. And I think it's very clear, when you look at what the board did, is that he applied the agreed construction of the parties. He took into consideration both Microsoft's arguments and our arguments. By he, you mean the three-member board? The panel, yes. Yes, Your Honor. And came to the conclusion that based upon the client computer having to perform another action that was exactly the same as what started the entire process, there was a second request. And I think that the key piece of evidence that he cited to and that he considered was the admission of Microsoft's expert. I'm sorry. Do you mind talking about the panel? I get extremely confused. I apologize. Yes, Your Honor. The panel, the evidence that the panel considered and pointed to that was most important, I think, was the admission of Microsoft's expert, Mr. Mitzemacher, who at his deposition testified that there was two distinct initiation actions in S-Web 95 that took place necessarily. And based upon that finding, that fact, coupled with the panel's analysis of the rest of the prior art, they concluded that the second request that is generated took it outside of the scope of the 335 and 554 patent claims. Now, there's arguments that were made by Microsoft regarding these additions that the panel added allegedly. Can I just ask, just as a matter of describing the process, was you generally familiar with O2 micro? Yes, Your Honor. Okay. So in district court world, sometimes what happens is as the proceeding goes along in your past claim construction, it turns out that the parties have a dispute, let's call it the scope of the claim. And there's some law growing out of O2 micro that says sometimes when a party says, Judge, we need a new claim construction, there's clearly a dispute about this. And sometimes the judge is required to do that. Did anything like that happen? Could it have happened in the oral hearing before the board? Because we're in this part of your dispute is did the board really do a claim construction? And in district court land, sometimes we resolve that by looking at the opportunity to say, do this as a claim construction rather than as an application. Yes, Your Honor. I think the board certainly had an opportunity and did do a claim construction. The way the case was postured was that when Microsoft filed its Was there a claim construction that resolved this issue? I don't see that. I don't recall, and correct me if I'm wrong, I don't recall that the parties really had a dispute about what a request was or that anybody asked for a claim construction about that. It seemed to be there was an agreed claim construction. Am I mistaken about that? There was an agreed claim construction in the district court proceedings between the parties. Microsoft's petition did not request, as it could have, a construction of requests. It did request construction of other terms. When the patent owner filed its responsive brief after institution, we requested that the board construe requests as agreed by the parties. So there wasn't any dispute really about it? Microsoft then, in its reply, did not propose formally any response, and so I don't think there was a dispute, Your Honor, as far as what the construction of requests was. So you're saying the parties effectively agreed to the construction that had been adopted in the district court proceedings? Yes, Your Honor. Can I ask you to turn, if it's okay with my colleagues, to the Misenmacher Declaration, 11449 in the appendix. Why is it not right to read that paragraph, which I guess is a two-page paragraph, as saying not just that there are advantages to splitting up into multiple servers to service of tasks, but that there are reasons to do so by forwarding as opposed to sending it back to the client and getting the client to do another thing? And I think to answer your question, if I understand what Your Honor is asking, is I read paragraph 214, which is on appendix 11449, and crossing all the way to appendix 11451. What I read Mr. Misenmacher saying there is there is a generic benefit known in the art to request forwarding. What do you understand, or what do you think he meant by request forwarding? I think what he meant by request forwarding Does that mean this, as well as this, or just this? I think all he meant was that something comes to a computer and it gets sent on to another computer. That's all I think that he meant. Without regard to whether that sending on is direct or back through the client. That's how I initially read this, but I think the argument is that that is, and that's one of the reasons maybe that the SWEB overhead material is not cited here. And the freeing up of CPU cycles and memory resources is independent of how it gets to the second server. I sort of read this in a way that this was not really addressing the dispute between the backup to the apex of the triangle or directly to the other vertex. If by backup to the apex of the triangle you mean the URL redirection, Your Honor? Yes. So I think he was addressing that here, because I think that if you look at the beginning of paragraph 214, he's talking about the alternative argument that if patent owner makes that if routing is not disclosed in SWEB 95. Okay, but if he's talking about that, why is that not enough of either to come within KSR, which may not quite require a motivation to choose among certain kinds of known substitutes, or in any event enough of a motivation to meet, to be the standard. And the board simply said he hasn't identified a motivation. Right. And I think the reason why it's not enough as to what's said in this paragraph 214 from his declaration, is that he doesn't engage as KSR instructed on why a person of skill in the art being put in the position that he or she would be here. Why is a change going to be made? In other words, what he's doing, would you agree that what he's doing, he's saying that request forwarding has advantages, right? I agree. Okay. And what you want him to say, apparently, is it's better than URL redirection. Either better or there is some other advantage that's given to the system by taking URL redirection away and putting request forwarding in. I wouldn't go so far as to say it's absolutely mandatory that it be strictly better than URL redirection, but there's got to be some reason why a person, and it may be because it's better, but there may be some other reason a person of skill in the art looking at this problem, looking at this particular reference would have said, you know what, I would rather do this, or this is something that we should try to do, rather than URL redirection. And Mr. Mitzemacher didn't do that in a declaration. So do you agree that we don't really have any cases which address that question? I think there's lots of cases in which there's instruction that you have to provide and you have to find a reason for whether or not the person of skill in the art is going to make the modification or make the change to their prior art reference. There aren't any cases that say the motivation has to be that it would be better, right? I think if you read the cases that were cited here, I think that those words may not exactly be in the cases, so I'll agree with your honor in that respect, but if you look at the train of thought and what KSR taught us, I think KSR taught us that there has to be this common sense that's looked at to see, you don't just do it to do it. That's where hindsight's going to come in. You don't just make the change because, well, it's out there. It seems to me kind of odd in a way that you're saying that he has to show that request forwarding is better than URL redirection, whereas the theory of the patent is that it's inherently better, right? I don't think the patent makes a claim that it's inherently better. I think part of the invention, part of the novelty of the claims— It's just that it's different, it's not better? I think in the architecture, it's better. I mean, I think that that was proven by history and that URL redirection isn't used, whereas this request forwarding system was, but I think at the time, I don't think that was something that a person of skill in the art would have known or accepted or believed. I think that still had to be played out in the art. I know it was a long time ago, so it's hard to put ourselves in the place of a person of skill in the art back in that point in time. But I don't think it was just accepted that in that particular architecture, one would be better than the other. Could we talk for a minute about the Unix thing? Do you agree that the only issue here is enablement? I don't agree with that, Your Honor. I mean, I think that that is an issue, but I think that the primary issue is that Microsoft and IBM didn't raise this— Okay, suppose we reject that. Yes, Your Honor. The only issue then is enablement, right? I think that's fair, yes. Okay. But as I read the experts here, neither one of them really addressed enablement. Is that fair? I don't think that's fair. I think that what Dr. Jones, Parallel Network's expert, said, and what S-Web itself says, is that it would be difficult for a person of skill in the art to change the Unix kernel, which according to the authors of S-Web— But something can be enabled and to be difficult at the same time, can't it? I think by the way that it's phrased and the way it's referred to is that they're basically saying, look, this is something that a person of skill in the art may know how to do, but we don't know. And they certainly in the reference did not describe anything about it beyond just saying it would be difficult, you'd have to change the kernel. So the board didn't address this enablement question, right? Well, I think they did not address it in the anticipation section of the brief. I agree with that. In the obviousness section—I apologize. The panel did not address it in the anticipation section of the final written decision. However, in the obviousness section of the final written decision, they listed our argument— They didn't address it there as an enablement question either, right? Because it wouldn't be an enablement question. Well, and that's what they referred to as the merit that there was this difficult issue of the kernel, Unix kernel, and acknowledged that that argument had merit. Now, did they refer to enablement specifically? No, Your Honor. Assuming that we conclude that it was properly raised, don't we have to send it back for them to address this question? I don't think it needs to be sent back to address this question because I think that even if— well, the question assumes that it was raised. Is that what, Your Honor? Yes. In that case, I think the statement by the board that the difficulty— I'm sorry. That's at page 22, and all that is is a description of your contention. It's not a finding, but— Let me make sure we're on the same page, Your Honor. Page 22, appendix 22. Yes, appendix 22, Your Honor. Well, Parallel admits that Swebb discusses the possibility of a Unix socket package. It notes that this alternative was dismissed as difficult. According to Parallel, this signifies that the modification was nontrivial and beyond ordinary skilled artisan. But that's, as I take it, just a description of your argument. That's correct. But if you look at the next sentence, the panel states that although we believe Parallel's arguments have merit, referring to the listing of what those arguments were preceding— It's a bit different than saying it's correct, right? Well, I think that— And then it goes on to say it's relying not on that, but on the motivation. It rests primarily on the fact that it then discusses, Your Honor. So why don't we have to send it back? Well— Assume it's properly raised. Because I believe that that section that we've just read in court provides sufficient basis to conclude that to one of skilled in the art, it wouldn't have been enabled and was beyond a person of skill in the art. Okay. Anything else? Thank you, Your Honor. Okay, thank you. Mr. Crowley, you have two minutes. Thank you, Your Honor. To go back to the paragraph 214 of the expert's declaration, and I'll let— And, Judge Toronto, I apologize. I didn't fully understand the question you were asking. I think it is, particularly right in context, I think it's clear that he's talking about— in the URL redirection sense. I think he's talking about put URL redirection to one side. Request forwarding is another way that has advantages of doing this. I think it's clear from the context because the paragraph before that, he's talking about URL redirection. Then also, paragraph 42 of his reply declaration, which is at appendix 15946, he makes it very explicit that what he was talking about in 214 and what he's talking about in his reply is request forwarding as separate and distinct from URL redirection. And just as it happens, I mean, I just haven't looked at this yet, but after those sentences about request forwarding, he cites Burson, which is exhibit 1036, which we have, I guess, a piece of.  Do the things that he's—and Pfister. And those are traditional request forwarding, not URL redirection, Your Honor. So I think the context makes it clear. And I think it's very clear under KSR it does not have to be better. It's a known technique for doing the same thing. It was within this level of skill of ordinary skill in the art. And the other last point I want to make is Mr. Bovenkamp started with a reference to our experts talking about distinct initiation actions. What our expert was talking about, and this is at—his testimony is at appendix 20801 and 02, was a refreshed request, which is a new action by a user, sends a new request to the web server that then has to go through the whole process again of having the dispatcher decide which page server is best to handle it and all of that. So it's a completely different situation than URL redirection. Can I ask a question? Does the specification of the patent here or of the patents here talk about a comparison between URL redirection and request forwarding? No, it doesn't mention URL redirection. And it doesn't use the term request forwarding. It just says dispatch from the web server to a page server. It doesn't talk about how. And so we say it doesn't exclude URL redirection. It just says get it from one to the other somehow. One other question. I don't think you made this argument. Maybe you can just clarify. Sometimes in this web system, the recipient, the initial web server, will say, oh, I've got lots of free time. I'll just keep it. Why would that not come within the claims? Why would that not come within the claims? Yeah, do the claims actually require sending it to a different place? Well, they don't. Actually, they don't require sending it to a different machine because the constructions of web server and page server both refer to software. So I think it actually could be two units of software on the same machine. And it just, you know, the receiving piece of software says, okay, this machine can handle it and hands it off to the processing, you know, the page server software. So in theory, it could all be on the same machine. We've been talking about it as different machines. But it could all be on the same machine. Thank you. Okay. Thank you, Mr. Taylor. I thank both counsel. The case is submitted.